ANTONIO FANTAUZZI RIVERA, ETC., demandantes y recurrentes y recurridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, ETC., demandados y recurridos, y recurrentes.

*Números:* R-79-319,  *Resueltos:* 1 de junio de 1981
R-79-320

*Héctor A. Colón Cruz, Procurador General,* y *Ricardo Alegría Pons, Procurador General Auxiliar,* abogados del recurrente; *José A. Virella Santana,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

■■■ El demandante Antonio Fantauzzi Rivera fue víctima de la impericia y crasa negligencia de un médico del Hospital de Distrito de Aguadilla quien le operó de amígdalas el 15 mayo, 1969 olvidando suturar las fosas en los pilares inferiores, sobreviniendo una hemorragia que no supo controlar el cirujano, el paciente absorbió la sangre hacia los pulmones y siguió un paro cardíaco y respiratorio con falta de sangre en el cerebro (hipoxia). Fue trasladado todavía con hemorragia al Centro Médico de Río Piedras donde prontamente detuvieron la pérdida de sangre suturando los pilares olvidados. No se cuestiona la angustia física y moral del operado, de su esposa y de su único hijo originada por la mala práctica médica. La contención se circunscribe a cuan extensa es la incapacidad de Antonio Fantauzzi derivada de los minutos en que se redujo la afluencia de sangre a su cerebro. La sala de instancia creyó la alegación del demandante de que sufría un estado esquizofrénico tipo paranoide severo, sin expectativa de recuperación [1] y en una primera sentencia de 18 julio, 1978 concedió a la familia daños por sufrimientos morales y lucro cesante por un total de $346,852.00 contra el Estado, a tenor de la Resolución Conjunta Núm. 42 aprobada el 16 mayo, 1974 (Leyes de ese año, Parte 2, pág. 418) que autorizó la acción civil sin sujeción a los límites de Ley Núm. 104 de 29 junio, 1955 (32 L.P.R.A. sec. 3077 y ss.). A mociones de reconsideración y de relevo de sentencia (Regla 49.2) del Gobierno demandado basadas en

[1] El párrafo 25 de sus determinaciones de hecho dice:

"Como resultado de la experiencia sufrida y la crisis sobrevenida, el Sr. Fantauzzi Rivera desarrolló agudos e intensos problemas emocionales y mentales sufriendo de alucinaciones, manías de persecución, intentos de suicidio y una eventual distorsión total de su personalidad degenerando ello en un estado esquizofrénico tipo paranoide, severo, del que aun no se ha repuesto, sin que haya expectativas de recuperación."

falsedad de la prueba de incapacidad total del demandante, el tribunal ordenó reapertura y continuación del juicio para recibir prueba sobre el particular. Como resultado de dicha prueba el juez sentenciador rechazó la teoría mantenida por los demandantes, tachó su prueba de engañosa [2] y modificó sus conclusiones sobre la cuestión esencial de incapacidad con el siguiente dictamen:

Un análisis calmado y sereno de lo antes relatado conduce inevitablemente y a la luz de nuestras observaciones y credibilidad del resto de la prueba desfilada por las partes, a concluir,

(a) la psicosis que padece Don Antonio Fantauzzi es el producto de un síndrome cerebral orgánico sin que concurra el aspecto de la esquizofrenia. Su condición es crónica, irreversible (por ser consecuencia también de daño cerebral irreversible).

(b) Tal condición ha producido un menoscabo sustancial en las facultades mentales de Don Antonio que lo incapacita permanentemente para emplearse productivamente.

(c) No obstante, su incapacidad no le impide desenvolverse con relativa estabilidad en su diario vivir lo que le ha permitido y permite compartir —aunque con las limitaciones resultantes de su menoscabo intelectivo— en un plano de relativa calma y tranquilidad en actividades de variada naturaleza en el cotidiano vivir. Es dentro de ese plano único que es explicable que se hayan realizado diversas transacciones con inmuebles sin previa autorización judicial, y que no se haya tramitado la designación de un tutor para administrar los fondos provenientes de las pensiones de Veteranos y Seguro Social.

Procedió entonces a reconsiderar su sentencia y a pronunciar otra *nunc pro tunc* el 16 agosto, 1979 en la que redujo todas las partidas de daños a la suma global de $138,988 que se desglosa así:

---

[2] La distorsión y exageración de la prueba de los demandantes, práctica infortunada y frecuente en la litigación de daños, no tiene dimensión de fraude al Tribunal. Aún así se ajustó a derecho la reapertura del caso para oír nueva evidencia en reconsideración.

(a) Antonio Fantauzzi Rivera,
   (1) por concepto de lucro cesante ........... $ 41,152.00
   (2) por daños físicos y angustias mentales y
      morales .............................. 20,000.00
(b) Ana Lydia Cruz,
   (1) por concepto de lucro cesante ........... 49,836.00
   (2) por concepto de angustias mentales y
      morales .............................. 20,000.00
(c) Ithram Fantauzzi Cruz................... 8,000.00
     GRAN TOTAL...................... $138,988.00.

Condenó al Estado, además, al pago de $2,906.00 de costas e intereses desde la fecha de la sentencia.

Ambas partes han recurrido en revisión, el Estado en solicitud de que se reduzca la compensación de Fantauzzi; y éste, a su vez, con señalamientos dirigidos al restablecimiento de las cuantías originalmente concedidas. El examen del legajo de sentencia en su totalidad, que comprende una extensa exposición narrativa de la prueba nos convence de que en el recurso R-79-320 de los demandantes, el auto fue indebidamente expedido.

██ La prueba de incapacidad de Antonio Fantauzzi, aparece fatalmente viciada de exageración y falsedad al punto en que no sosteniendo la teoría de anulación total de sus facultades propuesta por los demandantes, y sí más bien una condición histérica o síndrome cerebral orgánico de sintomatología leve que se trata con valium y librium; con propensión a la exageración y simulación de conducta en beneficio propio, es imposible determinar racionalmente el grado real de incapacidad a los fines de estimar el lucro cesante.

La prueba estableció que el demandante Fantauzzi, agente comprador de Moda Shoe Corp., con cursos de teneduría de libros y operación de máquinas calculadoras, durante nueve años transcurridos desde la tonsilectomía hasta el juicio civil, realizó actos incompatibles con el grado de supresión de su capacidad que alega en la demanda, a saber: recibió y administró personalmente

pensiones de incapacidad de la Administración de Veteranos y de Seguro Social, sin que jamás se le haya designado tutor; otorgó con su esposa unos cuatro documentos públicos en que los notarios autorizantes avalaron su capacidad para contratar; renovó en dos ocasiones, mediante certificados de salud expedidos por médicos distintos, su licencia de conducir; conservaba un arma de fuego mediante permiso de posesión del Superintendente de la Policía; en contratos de compraventa trató de obtener el mejor precio, y en uno de los otorgamientos discutió y transigió sobre el pago de gastos legales; tenía libre uso de un machete que usaba en labores en el patio de la casa; nunca se envolvió en episodio de violencia o ataque a otra persona; garantizó en el Banco un préstamo de $35,000 de su hijo con un estado de situación de $150,000.00; relató a un abogado notario amigo, con quien estuvo en la escuela, los detalles de su operación y dejó en él la impresión de hallarse en sus cabales, apto para contratar, en ocasión en que acompañó a su esposa a suscribir una opción de compra; viajó con la familia de paseo a Santo Domingo; y luego de haberse alegado su aversión a los tribunales y aglomeración de personas fue centro de un episodio que el juez sentenciador relata así:

El desfile de la prueba de estas mociones tomó cinco días. Sin ser requerido para ello Don Antonio era traído por su esposa todos los días y mantenido en los pasillos del Tribunal, sin incidentes. El tercer día de desfile de prueba la parte demandada pidió sentar a Don Antonio como su testigo. Los abogados de la parte demandante advirtieron sobre posible arrebato de violencia. Se permitió sentar a Don Antonio.

Contestó dos preguntas: nombre y lugar de residencia. La tercer pregunta fue si recordaba haber otorgado alguna escritura. Tornó su rostro mirando al techo, movía su cabeza girando el cuello en forma circular, ponía los ojos en blanco. Estuvo así por más de un minuto.

Los abogados del E.L.A. expresaron no tener más preguntas. El Tribunal le instruyó a retirarse, sin que hiciera

gestos de clase alguna. Se le acercaron su esposa y otra persona que le habían acompañado a la silla de los testigos. Salió de la silla. Cuando iba ya de salida reaccionó con violencia gritando "me van a degollar". La esposa le contestaba "no te van a hacer nada". Dos alguaciles, miembros de la familia y otra persona se aproximaron para sujetarle. Don Antonio, ya tomado de los brazos por tales personas y alguaciles, lanzó varios puntapiés dirigidos todos a los dos alguaciles. Eventualmente en medio de tal situación, fue sacado de la Sala. Luego no fue traído más al Tribunal ni ese día ni otros dos días más que duró el desfile de la prueba.

Es sobre esta conducta que se produce el criterio médico pericial del siquiatra Dr. Fernández Cuebas que en parte transcribimos:

. . . Por lo observado en la entrevista el paciente no estaba sicótico. La condición de don Antonio es consistente con un síndrome cerebral orgánico, no cree envuelta una condición esquizofrénica. El médico declaró sobre un proceso emocional crónico contrapuesto al menoscabo de funciones intelectuales a causa de la cronización del proceso emocional lo siguiente: (a) Que la personalidad histérica utiliza y exagera los síntomas para su beneficio; (b) no hizo afirmación definitiva de que el caso de don Antonio sea una u otra cosa. Expresó, en teoría, que la cronización de un proceso emocional significa que ese proceso ha durado mucho, no necesaria-mente que sea severo. Cuando ocurre dicho proceso puede menoscabar las funciones intelectuales por falta de uso de dichas funciones intelectuales. Un momento de tensión puede exacerbar o mejorar la condición, dependiendo de cómo el paciente interpreta el estímulo.

Sobre el incidente ocurrido en sala, el médico declaró lo siguiente: Que puede ser resultado de un proceso de cronización emocional o puede ser resultado de una reacción histérica situacional o puede ser una simulación. Acepta que en el récord de la Administración de Veteranos hay un diagnóstico de propensión a episodios de histeria. El histérico tiende a la exageración, a la simulación, al exhibicionismo para su beneficio. Es una conducta representativa de una condición siquiátrica.

El histérico es más propenso a somatizar que el esquizo-frénico. La conducta histérica se va aprendiendo, se tiende a la formación de hábito, puede desarrollar una sintomatiza-ción crónica. Cuando esto ocurre, la reacción histérica tiende a mantenerse y no se cura.

Declaró que los medicamentos recetados por el Dr. García Saavedra a Fantauzzi: librium y valium son tranquilizantes menores, para condiciones emocionales no severas.

Se le preguntó si una persona con esquizofrenia tipo paranoide, síndrome orgánico cerebral, si bajo las mismas, las personas tienen la capacidad de exagerar o aumentar. Contestó: "Sí, en la medida que una persona entiende, la capacidad para saber lo que tiene —autocrítica— puede hacerlo." "Puede mejorar, el conocer su propio padecimiento lo puede ayudar. No es tan severa su condición." "En la medida que tiene la capacidad para autocriticarse denota mejoría. Tiene capacidad de mejorar. Una persona que está severamente afectada no tiene esta capacidad." Declaró: "yo sé que no estaba psicótico".

Sobre las preguntas hipotéticas declaró el Dr. Fernández: "El proceso de argumentar, el poder de regateo implica poder preveer hasta cuestiones fraudulentas en su contra." El hablar de su pasado refleja memoria. La cuestión de comprador, como una persona puede cambiar. Tiene la capacidad de cambiar de rol. Son tantas y variadas. Ciertamente es inconsistente con un psicótico crónico, severo. No se deja engañar. Para poder contar necesita capacidad de abstracción. Todo esto va en función del trasfondo académico. No es un profesional. No podemos esperar de él una capacidad de abstracción grande. En algunas específi-cas, es índice de juicio aceptable, capacidad afectiva, sintonización y radiación. No está menoscabado. Una auto-crítica aceptable. Una capacidad de manipulación, capacidad de argumentar, de preveer, de movilizarse, de ciertas destrezas especiales de discutir y acordar compraventa de propiedad. (ENP. págs. 13–15.)

■ Esta prueba, unida a las reflexiones del juez sobre los méritos de la posición de los demandantes, dejan la incapacidad de Fantauzzi sin *garantía de legitimidad* en que pueda fundarse la adjudicación de pérdida de ingresos. La confusión en la prueba médica y la testifical sobre

conducta de Fantauzzi no permite llegar a una apreciación del grado de incapacidad que le aflige, y en tales circunstancias no debe concederse compensación por lucro cesante. Se expresa sobre este aspecto el Prof. Prosser así:

> [L]a única objeción válida contra el resarcimiento de daño moral es el peligro de pleitos hostigantes y reclamaciones fingidas, que en las opiniones ha surgido como obstáculo de gran dimensión. El peligro es real, y debe ser enfrentado. La perturbación mental es de fácil simulación y las cortes abrumadas con reclamaciones de daño personal se resisten a abrir la puerta a un campo todavía más dudoso. Mas la dificultad no es insuperable . . . Es enteramente posible permitir el resarcimiento únicamente con base en evidencia satisfactoria, y denegarlo cuando nada hay que corrobore la reclamación, o buscar alguna garantía de legitimidad en las circunstancias del caso. El problema se reduce a uno de prueba adecuada, y así no es necesario denegar remedio en todos los casos porque algunos sean simulados. Prosser, *Law of Torts*, 4ta ed., 1971, pág. 328.

La mengua en la capacidad productiva de doña Ana Lydia Cruz, esposa de Fantauzzi no es permanente, pues no está predicada en su incapacidad, sino en la necesidad de abandonar su empleo para dedicarse a la atención de su esposo enfermo. Por tanto, el tiempo base para calcular su lucro cesante no es su propia expectativa de vida útil, sino la duración de la causa interruptora de su actividad productiva, equivalente a la expectativa de vida de Fantauzzi computada desde la fecha del accidente, que es 21.65 años. Ella estuvo ausente de su trabajo desde el 15 mayo hasta el 30 junio, 1969, sufriendo la pérdida de salario de $69.00 semanales por 6 1/2 semanas, que suman $448.50. Cesó definitivamente en su empleo el 15 noviembre, 1969 para cuya fecha le quedaban a su esposo 21.15 años de vida. Según la fórmula adoptada por el tribunal la proyectada pérdida de su ingreso es $35,408.75 a la que sumada la partida anterior de $448.50 dan un total de $35,857.25.

*Con estos antecendentes y fundamentos, se suprime y elimina la partida de $41,152.00 concedida a Antonio Fantauzzi por concepto de lucro cesante; y se modifica la de $49,836.00 por igual concepto otorgada a su esposa Ana Lydia Cruz, reduciéndola a $35,857.25, y así modificada la sentencia enmendada nunc pro tunc de 16 agosto, 1979 será confirmada.*

El Juez Asociado Señor Irizarry Yunqué emitió opinión disidente a la que se une el Juez Asociado Señor Torres Rigual. El Juez Asociado Señor Negrón García disintió sin opinión.

—O—

Opinión disidente del Juez Asociado Señor Irizarry Yunqué a la cual se une el Juez Asociado Señor Torres Rigual.

San Juan, Puerto Rico, a 1 de junio de 1981

Disiento. La sentencia recurrida debería confirmarse sin modificación alguna.

Es un hecho indisputado que como consecuencia del paro respiratorio y cardíaco que se produjo debido a la manifiesta negligencia del personal médico que trataba al Sr. Fantauzzi Rivera, éste sufrió daño cerebral irreparable e irreversible debido a la falta de oxígeno al cerebro. Así lo concluyó el Tribunal Superior en una extensa resolución de fecha 16 de agosto de 1979, a base de la cual enmendó substancialmente, *nunc pro tunc*, la sentencia que había dictado el 18 de julio de 1978. Dicha resolución se basó en "abundante desfile de prueba de ambas partes, incluyendo prueba testifical, documental y pericial", [1] dirigida toda dicha prueba a una reevaluación de la "capacidad mental del señor Fantauzzi Rivera y daños provenientes de tal condición". [2]

---

[1] Resolución de 16 de agosto de 1979, pág. 2, 2do párrafo.

[2] Véase la misma resolución, página y párrafo referidos en el escolio (1).

Luego de pasar sobre dicha prueba, cuyo desfile tomó cinco días, de escuchar testigos que nosotros no hemos visto ni oído, y de evaluar su credibilidad —función para la que obviamente estaba el tribunal de instancia en posición preeminente— concluyó el ilustrado juez sentenciador, Hon. Aladino Torres Rivera: "Se sostiene la conclusión que el señor Fantauzzi Rivera *ha quedado afectado de sus facultades mentales en grado tal que le incapacitan para emplearse productivamente en forma permanente.* Tal es el consenso de opinión de tres peritos psiquiatras que en diversos momentos comparecieron al Tribunal."[3] (Énfasis nuestro.)

Esta conclusión no fue hecha a humo de pajas. Fue hecha luego del tribunal enfrentarse a una situación mortificante, convencido de que sus primeras determinaciones sobre los hechos en cuanto a los mencionados aspectos de capacidad mental y daños provenientes de tal condición del señor Fantauzzi fueron objeto de exageración y de ocultación de datos al Estado facilitándose así una estipulación que luego el Estado rechazó. El señor Juez Torres Rivera no podía estar, al evaluar la prueba que produjo la resolución de 16 de agosto de 1979 y la "sentencia enmendada *nunc pro tunc*" de esa misma fecha, en la misma condición de ánimo no prevenido que cuando evaluó los daños originalmente. Su mencionada resolución así lo demuestra palmariamente. No obstante, he aquí sus conclusiones finales:

4—Un análisis calmado y sereno de lo antes relatado conduce inevitablemente y a la luz de nuestras observaciones y credibilidad del resto de la prueba desfilada por las partes, a concluir,

(a) La psicosis que padece Don Antonio Fantauzzi es el producto de un síndrome cerebral orgánico sin que concurra el aspecto de la esquizofrenia. Su condición es crónica, irreversible (por ser consecuencia también de daño cerebral irreversible).

[3] Resolución de 16 de agosto de 1979, citada *supra*, pág. 2, *in fine*.

(b) Tal condición ha producido un menoscabo sustancial en las facultades mentales de Don Antonio que lo incapacita permanentemente para emplearse productivamente.

(c) No obstante, su incapacidad no le impide desenvolverse con relativa estabilidad en su diario vivir que le ha permitido y permite compartir —aunque con las limitaciones resultantes de su menoscabo intelectivo— en un plano de relativa calma y tranquilidad en actividades de variada naturaleza en el cotidiano vivir. Es dentro de ese plano único que es explicable que se haya realizado diversas transacciones con inmuebles sin previa autorización judicial, (¹) y que no se haya tramitado la designación de un tutor para administrar los fondos provenientes de las pensiones de Veteranos y Seguro Social.

(d) Todo lo anterior era necesariamente de conocimiento de los demandantes al momento de negociar la estipulación con la parte demandada relativa a la condición de Don Antonio a resultas de la citada operación.

5—Todo lo anterior, no obstante, no altera las demás conclusiones de hechos de la sentencia relativas a las angustias sufridas por los demandantes a raíz del trauma operatorio, hospitalización y otros particulares.

6—A la luz de lo antes expuesto entendemos, como cuestión de hecho, que las compensaciones concedidas en la sentencia por daños físicos y angustias mentales y morales deben ser modificadas para ajustarlas a la situación aquí descrita. (⁴) (Escolio omitido.)

En consecuencia de dichas determinaciones el tribunal sentenciador enmendó las cuantías concedidas en la siguiente forma: (a) en cuanto a "daños físicos", y "angustias mentales y morales" redujo de $75,000.00 a $20,000.00 lo concedido al Sr. Antonio Fantauzzi Rivera, de $50,000.00 a $20,000.00 lo concedido a su esposa doña Ana Lydia Cruz, y de $25,000.00 a $8,000.00 lo concedido al hijo de ambos, Ithram Fantauzzi Cruz; y (b) en cuanto a lucro cesante redujo de $100,265.00 a $41,152.00 lo concedido al Sr. Fantauzzi Rivera, y de $96,587.00 a $49,836.60 lo adjudicado a doña Ana Lydia Cruz. Las partidas por lucro

---

(⁴) *Ibid.*, págs. 10–12.

cesante fueron computadas por el tribunal sentenciador a base de los factores clásicos, a saber, ingreso anual en la fecha en que se origina la incapacidad, daños productivos según expectativa de vida, y el factor de capitalización.

Para anular la partida de lucro cesante adjudicada al señor Fantauzzi Rivera se basa este Tribunal en aislados aspectos de algunos testimonios periciales y en un enfoque restrictivo sobre la conducta de este demandante con posterioridad a los incidentes de su hospitalización y tratamiento. No creo que ello se justifique. Las determinaciones del tribunal sentenciador se basan en *la totalidad de la prueba testifical* que vio y oyó, analizada con criterio riguroso ante la previa experiencia de exageración y ocultación. Ante el hecho indubitado de la severa incapacidad resultante no puedo suscribir que se descarten las bien fundadas y objetivamente analizadas conclusiones del ilustrado magistrado sentenciador.

Ni siquiera la parte recurrente llega tan lejos como lo hace este Tribunal. Dos son los planteamientos que hace la parte recurrente: el primero, que la cuantía concedida por daños físicos y angustias mentales rebasa los límites de la Ley Núm. 104 de 29 de junio de 1955 (32 L.P.R.A. secs. 3077 a 3084) y, segundo, no reducir las cuantías otorgadas a los demandantes por concepto de lucro cesante en una proporción mayor, atendido el grado de incapacidad del señor Fantauzzi Rivera.

En cuanto al primer planteamiento, baste señalar que la autorización para que se concedieran cuantías sobre el límite de la citada Ley Núm. 104 fue concedida por resolución de la Asamblea Legislativa CRC Núm. 42 de 16 de mayo de 1974. El segundo planteamiento no impugna la adjudicación de lucro cesante al Sr. Fantauzzi Rivera y sí su cómputo. Se pide su reducción; no su eliminación. Eliminar la concesión de lucro cesante es contrario al principio de que nuestro Derecho es rogado, basado en el sistema adversativo de la contienda judicial.

Confirmaría sin modificación alguna la sentencia recurrida.